## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**TAMIKA LANE-GARDNER**,

      Plaintiff,

v.                                    CASE NO.:    8:08-CV-01414-EAK-EAJ

**CITY OF TAMPA**,

      Defendant.

_____/

## THIRD AMENDED COMPLAINT

Plaintiff, Tamika Lane-Gardner, hereby sues Defendant, City of Tampa. The claims and demand for jury trial on all claims are described more fully below.

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, Tamika Lane-Gardner ("Mrs. Lane-Gardner"), was at all relevant times a resident of Hillsborough County, Florida.

2.     Defendant, City of Tampa, is a local governmental entity within the State of Florida. At all relevant times, Defendant City of Tampa operated the Tampa Police Department ("TPD") and employed Detective Sonja McCaughey and Officer Larry McKinnon.

3.     While not a defendant in this case, Detective Sonja McCaughey was at all relevant times a police detective for the City of Tampa's TPD and acting under color of law, in that she was acting under color of statutes, ordinances, regulations, policies, customs, practices, and usages of the City of Tampa's TPD.

4.     While not a defendant, Officer Larry McKinnon was at all relevant times the spokesperson for TPD's Public Information Office and a duly appointed and acting

officer of the City of Tampa's TPD. At all relevant times, Officer McKinnon was acting under color of law, in that he was acting under color of statutes, ordinances, regulations, policies, customs, practices, and usages of the City of Tampa's TPD.

5.     While not a defendant, Major George M. McNamara is a Major with the Criminal Investigations Division for the TPD and has been designated as a City representative in this matter. As such, he is an authorized policymaker for Defendant, City of Tampa, and implements and controls its policies, practices and/or customs.

6.     The Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it arises under the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

7.     This Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this judicial district.

## GENERAL ALLEGATIONS

8.     Mrs. Lane-Gardner is a married mother of two and a lifelong resident of the Tampa Bay area. For some time prior to May 26, 2006, Mrs. Lane-Gardner worked as a teacher's aide at Walton Academy for the Performing Arts ("Walton Academy"), a Tampa charter school. Before the events described in this complaint, Mrs. Lane-Gardner had no criminal record of arrest.

9.     On May 11, 2006, a six-year old girl reported to her mother that a teacher's aid at the Walton Academy had touched her inappropriately. The mother contacted the police, and three TPD officers were dispatched to interview the girl and her mother about the allegations.

2

10.     During the May 11th police interview, the girl claimed that her private parts were touched by "Miss Tameka" in the bathroom at the Walton Academy. Although the child told her mother that this type of touching had been going on "for a long time," the child was inconsistent and told the officers instead that this alleged touching was the first instance.  The mother explained to the police that her child was very shy and socially awkward.  The child was struggling with her grades at school and was frustrated with the curriculum.  The child told police that she wanted "Miss Tameka to get in trouble."

11.     On May 12, 2006, Detective McCaughey briefly interviewed four members from the Walton Academy staff.  Their names are Sheila Upshaw, Natelya "Kim" Constantine, Michelle Belcher, and Tanika Walton.  Unaware of the allegations, these witnesses spoke only of the purported victim, mainly offering that the child was quirky, introverted, and unsocial.

12.     Mrs. Walton even added that the child talks to herself, to the trees, and to her own wristwatch.  Ms. Belcher further explained that the child was recently frustrated at school and the child felt that her class assignments were too difficult.  The child would often cry and was inconsolable.

13.     None of the staff witness interviews corroborated the purported victim's story.  If anything, they placed the minor child's credibility in serious doubt.

14.     On May 12, 2006, Detective McCaughey also interviewed Mrs. Lane-Gardner.  Consistent with the staff witness accounts, including statements made by the child's mother, Mrs. Lane-Gardner described the purported victim as being socially awkward and explained how the child would wet herself and grunt if she accidentally

misspelled a word at school.  Mrs. Lane-Gardner adamantly denied the child's allegations and even became emotional and cried at the thought.   Again, this interview did nothing to corroborate the child's statements.  Instead, it only created more doubt.

15.   Also on May 12, 2006, the local Child Protection Team ("CPT") conducted a medical exam of the purported victim.  The results of this exam were straightforward.  There was no physical evidence of sexual assault.  While the report did not rule out sexual abuse, it added no evidence whatsoever to corroborate the child's allegations.  Due to its confidential nature, a copy of the Sexual Assault Medical Report has been previously filed separately as **Exhibit A** under seal pursuant to Local Rule 1.09.

16.   On May 19, 2006, the CPT conducted a forensic interview of the purported victim.  Again, the child repeated the general story:  "Miss Tameka" touched her inappropriately in the bathroom at the Walton Academy.  Besides the repeated general allegations, the forensic interview added nothing more to the child's original, uncorroborated account of sexual abuse.   In fact, the interview exposed more inconsistencies in the child's accusations.

17.   One time, the child stated her panties were up during the alleged "touching."  Another time, she stated her panties were down.  One time, the bathroom door was open.  Another time, it was closed and locked.  She was also inconsistent on the number of times the alleged touching occurred.

18.   Further complicating matters, the child and forensic interviewer were unable to mutually agree on the vocabulary to describe the alleged touching.  Important terms – such as "private parts" – were not properly defined by the forensic interviewer. The interviewer made numerous attempts to define these areas without success, and

ultimately settled and suggested her own generic term, "private parts." Additionally, the forensic interviewer used relatively sophisticated terms without explanation in her questions to the young child, such terms as "bathroom stall."

19.     Detective McCaughey never attempted nor cared to interview the child's mother or other family members.

20.     On May 26, 2006, Detectives McCaughey and O.P. Parrish paid an unannounced visit to Mrs. Lane-Gardner's home.  They took Mrs. Lane-Gardner to the police station, and then they interrogated her further.  While sometimes crying, Mrs. Lane-Gardner steadfastly denied each of the child's allegations, as she had done before, and then reiterated how the child is socially awkward and how the child's statements are terribly unreliable.  She implored the TPD detectives to investigate more facts.

21.     Detective Parrish believed that Mrs. Lane-Gardner was a credible witness and would have taken more investigatory steps before making the arrest on Mrs. Lane-Gardner.

22.     Nevertheless, on May 26, 2006, armed with only the child's uncorroborated allegations and faced with the child's dubious credibility and inconsistent statements, Detective McCaughey arrested Mrs. Lane-Gardner and charged her with a violation of section 794.011 of the *Florida Statutes,* which is felony capital sexual battery of a victim less than twelve (12) years of age (charge code 794011 2 – RAPE2000) (the "Child Abuse Case").

23.     After her arrest, Mrs. Lane-Gardner was taken to the Hillsborough County jail on Orient Road and held without bond.  Most of the time, she was held in solitary confinement.

24.     Representatives of TPD advised Mrs. Lane-Gardner that the basis for her arrest was the alleged sexual battery.   More specifically, TPD's Criminal Report Affidavit/Notice to Appear stated the following in support of determination of probable cause:

> the six year old minor victim told police that a teacher's aid touched their [sic] private parts under their [sic] clothes, touching skin while at school.  The minor victim pointed to their [sic] groin area and explained further with animation how the touch was done.   The victim identified the defendant as the person who touched their [sic] private area.   Defendant is identified as Tamika Denise Lane-Gardner.

A full and complete copy of the Criminal Report Affidavit/Notice to Appear is attached hereto as **Exhibit B**.

25.     Shortly after her arrest, Officer McKinnon, who was a fledgling assistant public information officer at the time, made an unsupervised public, on-the-record statement to the media in which he stated, unequivocally, that "[t]here was penetration of the child and that's what determines the case of sexual battery as opposed to lewd and lascivious or inappropriate touching."

26.     Officer McKinnon's statement that Mrs. Lane-Gardner had sexually penetrated the alleged victim had no evidentiary basis whatsoever. Furthermore, "penetration" was never alleged or written in the probable cause affidavit for Mrs. Lane-Gardner's arrest.   Nevertheless, the statement was widely disseminated by the press throughout the Tampa Bay area via print, radio, television, and internet mediums.   News of Mrs. Lane-Gardner "penetrating" a young child was reported by www.tbo.com, by WFTV (Bay News 9), by WTSP (Tampa Bay's 10), by the Tampa Tribune, and by the St.

Petersburg Times, among others, just as Officer McKinnon and TPD knew that it would be.

27.     Mrs. Lane-Gardner had no choice but to retain counsel to defend against the baseless charge.  She retained the law firm of Jung & Sisco in Tampa, Florida.

28.     The attorneys at Jung & Sisco first sought to have Mrs. Lane-Gardner, who had no prior criminal history, released on bond.  On June 1, 2006, the attorneys at Jung & Sisco filed a Motion to Set Bond on Mrs. Lane-Gardner's behalf.  That motion was heard on June 5, 2006.  At that hearing, the assistant state attorney, acknowledged that the evidence gathered by TPD consisted solely of a criminal report affidavit which did not contain descriptions of penetration of the alleged victim.  The assistant state attorney further acknowledged that the evidence gathered by TPD did not include any medical test results or other evidence supportive of a charge of capital sexual battery. The presiding judge stated that the evidence "[was] not sufficient to allege sexual battery."  Ultimately, the presiding judge granted the Motion to Set Bond for the modest amount of $15,000.  Mrs. Lane-Gardner then posted bond and was released from jail after ten (10) days spent primarily in solitary confinement.

29.     On June 14, 2006, Richard W. Keifer, of Keifer Group Investigations, conducted a polygraph examination of Mrs. Lane-Gardner.  His exam revealed that Mrs. Lane-Gardner had never "touch[ed] [the alleged victim's] private areas for any sexual purpose" and that Mrs. Lane-Gardner had never had "any physical sexual contact with" the alleged victim.

30.     On July 7, 2006, the attorneys at Jung & Sisco wrote to Carolle Hooper, Esquire, Assistant State Attorney, to inform her that the alleged victim's mother had in

the fall of 2004 made a strikingly similar accusation of sexual impropriety against a woman at a day care facility to whom the mother owed money.  Mrs. Hooper was also told that, the godmother of the alleged victim, had firsthand knowledge of the alleged victim's mother coaching the alleged victim as to what to say happened at the Abundant Life Ministries daycare.

31.     On August 8, 2006, the Hillsborough County State Attorneys' Office (the "SAO") dropped all charges against Mrs. Lane-Gardner.  In dropping the charges, the SAO cited three problems with the pending case according to news reports:

      a.     Mrs. Lane-Gardner had denied the charges and passed a polygraph test;

      b.     The SAO had found **no evidence** to corroborate the alleged victim's claims; and

      c.     The credibility of witnesses had become suspect.

32.     By the time the SAO dropped the charge against her, Mrs. Lane-Gardner had incurred thousands of dollars in attorneys' fees and costs in defending herself from the sexual battery charge.  In addition, the actions of the City of Tampa's TPD or Officer McKinnon in instituting, maintaining, and publicizing false charges of sexual battery against Mrs. Lane-Gardner have caused Mrs. Lane-Gardner severe emotional damage, damaged her reputation, and caused her to be socially isolated and ostracized.  Now, Mrs. Lane-Gardner must likely disclose the fact that she was arrested on future applications, like school and employment applications, and her arrest information (showing a charge of rape) with arrest photo still appears on the Hillsborough County Sheriff's website for all to see.  This incident will haunt her forever.

33.     Detective McCaughey never received discipline, counseling, or further training in connection with her improper probable cause determination, faulty probable cause affidavit, and unlawful arrest of Mrs. Lane-Gardner.   In fact, Major George McNamara, an authorized TPD policy maker, reviewed Detective McCaughey's probable cause determination and the basis for it, and approved her decision.

34.     The Defendants' conduct described in paragraphs 8 through 33 above deprived Mrs. Lane-Gardner of her constitutional rights under the Fourth Amendment in that she was arrested without probable cause.   Furthermore, that same conduct also deprived Mrs. Lane-Gardner of her constitutional rights under the Fourteenth Amendment in that she was subjected to false imprisonment and governmental defamation without due process.   The governmental defamation injured not only her reputation, but it also was made in connection with her unconstitutional arrest and effectively foreclosed her future opportunities to pursue her chosen occupation: teaching children.

35.     All conditions precedent have been satisfied or occurred in order to file this lawsuit, including Mrs. Lane-Gardner providing to the City of Tampa the required statutory notice of her intention to pursue this claim.   In response to Mrs. Lane-Gardner's notice, the City of Tampa initially solicited information from Mrs. Lane-Gardner (information which had already been provided by her) and then offered no further response.

## COUNT I: CIVIL RIGHTS CLAIM PURSUANT TO 42 U.S.C. § 1983
## POLICY, PRACTICE OR PROCEDURE
### (Municipal Liability against the City of Tampa)

36.     Mrs. Lane-Gardner realleges and reaffirms paragraphs 1 through 35, as if each were fully set forth here.

37.     The City of Tampa has a policy, practice, and/or custom that encourages or allows TPD employees to intentionally, or with reckless disregard for the truth, misrepresent material facts about pending cases to the media.

38.     Specifically, the TPD Standard Operating Procedures ("SOP") expressly advocate "an aggressive public information program" and instruct the TPD public relations department to maintain an "aggressive approach to providing information on matters of public concern to the news media and general public."  (SOP, § 540 – Media Relations, p. 1).  A copy of the SOP is attached as **Exhibit C**.

39.     There is no meaningful language in the SOP designed to temper or restrain this "aggressive approach" to providing information to the media.

40.     Coupled with this "aggressive approach," the SOP conspicuously fails to address and altogether omits any procedures or guidelines on either (i) the quality control of information disseminated by TPD to the media or (ii) confirming, or at least qualifying, the facts provided in public statements made to the media.

41.     This policy, practice, and/or custom of the City of Tampa caused or contributed to a violation of Mrs. Lane-Gardner's constitutional rights to due process under the Fourteenth Amendment of the United States Constitution.

42.     This policy, practice, and/or custom was implemented and controlled by Officer Stephen Hogue who, as Chief of Police, is a policymaker for the City of Tampa's TPD.

43.     The City of Tampa and Officer Hogue were deliberately indifferent to the fact that this policy, practice, and/or custom would deprive Mrs. Lane-Gardner of her rights to due process under the Fourteenth Amendment of the United States Constitution. Indeed, the City of Tampa and Officer Hogue knew or should have known that its TPD officers were misrepresenting material facts about pending cases to the media resulting in placing arrestees in a false light. Nevertheless, the City of Tampa and Officer Hogue approved, acquiesced, and/or encouraged these actions by, among other things, failing to adequately punish the TPD officers responsible for misrepresenting material facts about pending cases to the media.

44.     This policy or custom was the moving force behind the violation of Mrs. Lane-Gardner's rights to due process under the Fourteenth Amendment of the United States Constitution (as stated in paragraph 34 above). The City of Tampa has an express policy to aggressively disseminate information to the public, and this policy encouraged or allowed Officer McKinnon to make public statements to the media with reckless disregard and without any quality control. Mrs. Lane-Gardner has been damaged as a result.

WHEREFORE, Mrs. Lane-Gardner demands judgment against the City of Tampa for compensatory damages together with costs and interest as allowed by law.

## COUNT II: CIVIL RIGHTS CLAIM PURSUANT TO 42 U.S.C. § 1983
### LACK OF PROBABLE CAUSE/MONELL LIABILITY
### (Municipal Liability against the City of Tampa)

45.    Mrs. Lane-Gardner realleges and reaffirms paragraphs 1 through 35, as if each were fully set forth here.

46.    The City of Tampa, through its municipal policymakers, and more specifically, Major George McNamara, officially reviewed, approved, and ratified the basis and determination of probable cause by Detective McCaughey in this case.

47.    This review, approval, and ratification occurred more than once in this case.  At first, Detective McCaughey's decision was approved and ratified by municipal policymakers, including, but not limited to, Major McNamara, within weeks after Mrs. Lane-Gardner's arrest.  Most recently, the decision was approved and ratified on March 24, 2009 at the deposition of Major McNamara in this civil rights case.

48.    By such approval and ratification, the City of Tampa adopted and expressly approved of Detective McCaughey's probable cause determination and, therefore, approved of the acts that caused the constitutional violations in this case.

49.    Accordingly, the City of Tampa made the conscious, affirmative choice to ratify the unconstitutional conduct in question.  Based on this approval and ratification, the City of Tampa is responsible for Detective McCaughey's arrest of Mrs. Lane-Gardner in violation of her rights under the Fourth Amendment of the United States Constitution (as stated in paragraph 34 above) and is liable for Mrs. Lane-Gardner's damages as a result.

50.    Additionally, the City of Tampa maintained an inadequate system of reviewing probable cause affidavits filed by police officers and failed to discipline, or

more closely supervise, those officers who negligently or intentionally failed to sufficiently investigate or document the statements made in probable cause affidavits, such as the defective affidavit filed in the Child Abuse Case initiated against Mrs. Lane-Gardner.

51.     The foregoing acts, omissions, and deficiencies caused Detective McCaughey to be unaware of the laws and rules governing the correct procedures for the filing of a probable cause affidavit for the warrant and arrest of a suspected criminal. Also, the foregoing acts, omissions, and deficiencies further caused Detective McCaughey to believe that probable cause affidavits filed prior to a sufficient investigation of the underlying alleged incident would be condoned.

52.     As a direct and proximate result of each of the previously described ratifications, acts, omissions, and deficiencies, Detective McCaughey filed a probable cause affidavit prior to a sufficient investigation of the underlying alleged incident and thus, in turn, resulted in the issuance of an unsupportable, unsubstantiated, and illegal warrant for the arrest of Mrs. Lane-Gardner in violation of her rights under the Fourth Amendment of the United States Constitution (as stated in paragraph 34 above).  Mrs. Lane-Gardner has been damaged as a result.

WHEREFORE, Mrs. Lane-Gardner demands judgment against the City of Tampa for compensatory damages together with costs and interest as allowed by law.

## DEMAND FOR JURY TRIAL

Tamika Lane-Gardner demands a trial by jury.

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2009, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to **Ursula Danese Richardson, Esquire**, City Attorney's Office, 5th Floor – City Hall, 315 E. Kennedy Boulevard, Tampa, Florida 33602-5211.

s/ Alfred Villoch, III
Christopher S. Knopik, Esquire
Fla. Bar No.:  378348
cknopik@kmdlegal.com
Alfred Villoch, III, Esquire
Fla. Bar No.: 631434
avilloch@kmdlegal.com
KNOPIKMOOREDESKINS
One Harbour Place, Suite 800
777 S. Harbour Island Blvd.
Tampa, Florida 33602
Telephone:  (813) 221-3131
Facsimile:  (813) 221-3199
*Attorneys for Plaintiff*