UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**TAMIKA LANE-GARDNER,**

    Plaintiff

v.                                           Case No.: 8:08-CV-01414-T-17-EAJ

**CITY OF TAMPA,**

    Defendant.

_____/

## ORDER ON DEFENDANTS' MOTION TO DISMISS

This cause comes before the Court on Defendants' motion to dismiss Plaintiff's Third Amended Complaint (Doc. 43) and Plaintiff's response thereto (44).

## PROCEDURAL HISTORY

Plaintiff originally filed her Complaint on July 18, 2008, in the Thirteenth Judicial Circuit for Hillsborough County, Case Number 08-15922. On July 15, 2008, Defendant, City of Tampa filed its Notice of Removal with the state court (Doc. 1). Likewise, on July 23, 2008, Defendant filed its Notice of Removal with this Court, along with a copy of the original Complaint and other documents filed in the state court action (Doc. 2). Plaintiff then filed a five-count amended complaint on September 2, 2008 (Doc. 10). In response, Defendants filed a Motion to Dismiss on all counts on September 8, 2008 (Doc. 12). The Court granted Defendants' Motion to Dismiss Counts I, II, III. Further, the Court granted the Defendants' Motion to Dismiss Counts IV and V with prejudice (Doc. 18).

1

Plaintiff then filed a second amended complaint on March 9, 2009 (Doc. 23). In response, Defendant filed a Motion to Dismiss the second amended complaint on March 12, 2009 (Doc. 27). Plaintiff filed a response to the Motion to Dismiss the Second Amended Complaint on March 27, 2009 (Doc. 29).

After depositions were taken on March 20, 2009 and March 24 2009, Plaintiff filed a Motion for Leave to File a Third Amended Complaint on April 23, 2009 (Doc. 30). Plaintiff proposed to add facts from the depositions of Robert Parrish and Sonja McCaughey that would assist in stating a cause of action upon which relief can be granted. Defendant then filed a Response in opposition to Plaintiffs Amended Motion for Leave to File a Third Amended Complaint on April 27, 2009 (Doc. 31). Before the Court could rule on the motion, Plaintiff filed an Amended Motion for Leave to File Third Amended Complaint on June 3, 2009, that sought to add Detective Sonja McCaughey as a defendant (Doc. 35). Defendant filed a Response to the Amended Motion for Leave to File Third Amended Complaint on June 5, 2009 (Doc. 37). The Court denied the Plaintiff's motion to amend Count I as well as Plaintiff's motion to add Sonja McCaughey as a defendant. The Court granted Plaintiff's motion to amend Counts II and III. Now before the Court is the motion to dismiss the most recently pled complaint.

**STATEMENT OF THE CASE**

This is an action for damages alleging municipal liability against Defendant, City of Tampa, under 42 U.S.C. §1983, for deprivation of Plaintiff's constitutional rights leading to her arrest on May 26, 2006. The Fourth and Fourteenth Amendments of the United States Constitution form the basis of Plaintiff's claims against the City of Tampa,

arising from Plaintiff's arrest and imprisonment for felony capital battery of a victim less than twelve years of age, charged under Section 794.011 of the Florida Statutes.

## FACTS

Plaintiff alleges the following facts in support of her Third Amended Complaint (Doc. 40), which the Court is obliged to accept as true. Hinshon v. King & Spaulding, 467 U.S. 69, 72 (1984):

1. Plaintiff, Tamika Lane-Gardner ("Mrs. Lane-Gardner"), was at all relevant times a resident of Hillsborough County, Florida.

2. Defendant, City of Tampa, is a local governmental entity within the State of Florida. At all relevant times, Defendant City of Tampa operated the Tampa Police Department ("TPD") and employed Detective Sonja McCaughey and Officer Larry McKinnon.

3. While not a defendant in this case, Detective Sonja McCaughey was at all relevant times a police detective for the City of Tampa's TPD and acting under color of law, in that she was acting under color of statutes, ordinances, regulations, policies, customs, practices, and usages of the City of Tampa's TPD.

4. While not a Defendant, Officer Larry McKinnon was at all relevant times the spokesperson for TPD's Public Information Office and a duly appointed and acting officer of the City of Tampa's TPD. At all relevant times, Officer McKinnon was acting under color of law, in that he was acting under color of statutes, ordinances, regulations, policies, customs, practices, and usages of the City of Tampa's TPD.

5. While not a defendant, Major George M. McNamara is a Major with the Criminal Investigations Division for the TPD and has been designated as a City representative in this matter. As such, he is an authorized policymaker for Defendant, City of Tampa, and implements and controls its policies, practices and/or customs.

6. For some time prior to May 26, 2006, Mrs. Lane-Gardner worked as a teacher's aide at Walton Academy for the Performing Arts ("Walton Academy"), a Tampa charter school. Before the events described in this complaint, Mrs. Lane-Gardner had no criminal record of arrest.

7. On May 11, 2006, a six-year old girl reported to her mother that a teacher's aid at the Walton Academy had touched her inappropriately. The mother contacted the

police, and three TPD officers were dispatched to interview the girl and her mother about the allegations.

8. During the May 11th police interview, the girl claimed that her private parts were touched by "Miss Tameka" in the bathroom at the Walton Academy. Although the child told her mother that this type of touching had been going on "for a long time," the child was inconsistent and told the officers instead that this alleged touching was the first instance. The mother explained to the police that her child was very shy and socially awkward. The child was struggling with her grades at school and was frustrated with the curriculum. The child told police that she wanted "Miss Tameka to get in trouble."

9. On May 12, 2006, Detective McCaughey briefly interviewed four members from the Walton Academy staff. Their names are Sheila Upshaw, Natelya "Kim" Constantine, Michelle Belcher, and Tamika Walton. Unaware of the allegations, these witnesses spoke only of the purported victim, mainly offering that the child was quirky, introverted, and unsocial.

10. Mrs. Walton even added that the child talks to herself, to the trees, and to her own wristwatch. Ms. Belcher further explained that the child was recently frustrated at school and the child felt that her class assignments were too difficult. The child would often cry and was inconsolable.

11. None of the staff witness interviews corroborated the purported victim's story. If anything, they placed the minor child's credibility in serious doubt.

12. On May 12, 2006, Detective McCaughey also interviewed Mrs. Lane-Gardner. Consistent with the staff witness accounts, including statements made by the child's mother, Mrs. Lane-Gardner described the purported victim as being socially awkward and explained how the child would wet herself and grunt if she accidentally misspelled a word at school. Mrs. Lane-Gardner denied the child's allegations and even became emotional and cried at the thought. Again, this interview did nothing to corroborate the child's statements. Instead, it only created more doubt.

13. Also on May 12, 2006, the local Child Protection Teac ("CPT") conducted a medical exam of the purported victim. The results of this exam were straightforward. There was no physical evidence of sexual assault. While the report did not rule out sexual abuse, it added no evidence whatsoever to corroborate the child's allegations. Due to its confidential nature, a copy of the Sexual Assault Medical Report has been previously filed separately as **Exhibit A** under seal pursuant to Local Rule 1.09.

14. On May 19, 2006, the CPT conducted a forensic interview of the purported victim. Again, the child repeated the general story: "Miss Tameka" touched her inappropriately in the bathroom at the Walton Academy. Besides the repeated

general allegations, the forensic interview added nothing more to the child's original, uncorroborated account of sexual abuse. In fact, the interview exposed more inconsistencies in the child's accusations.

15. One time, the child stated her panties were up during the alleged "touching." Another time, she stated her panties were down. One time, the bathroom door was open. Another time, it was closed and locked. She was also inconsistent on the number of times the alleged touching occurred.

16. Further complicating matters, the child and forensic interviewer were unable to mutually agree on the vocabulary to describe the alleged touching. Important terms- such as "private parts" – were not properly defined by the forensic interviewer. The interviewer made numerous attempts to define these areas without success, and ultimately settled and suggested her own generic term, "private parts." Additionally, the forensic interviewer used relatively sophisticated terms without explanation in her questions to the young child, such terms as "bathroom stall."

17. Detective McCaughey never attempted nor cared to interview the child's mother or other family members. On May 26, 2006, Detectives McCaughey and O.P. Parrish paid an unannounced visit to Mrs. Lane-Gardner's home. They took Mrs. Lane-Gardner to the police station, and then they interrogated her further. While sometimes crying, Mrs. Lane-Gardner steadfastly denied each of the child's allegations, as she had done before, and then reiterated how the child is socially awkward and how the child's statements are terribly unreliable. She implored the TPD detectives to investigate more facts.

18. Detective Parrish believed that Mrs. Lane-Gardner was a credible witness and would have taken more investigatory steps before making the arrest on Mrs. Lane-Gardner.

19. Nevertheless, on May 26, 2006, armed with only the child's uncorroborated allegations and faced with the child's dubious credibility and inconsistent statements, Detective McCaughey arrested Mrs. Lane-Gardner and charged her with a violation of section 794.011 of the *Florida Statutes*, which is felony capital sexual battery of a victim less than (12) years of age (charge code 794011 2 – RAPE 2000) (the "Child Abuse Case").

20. After her arrest, Mrs. Lane-Gardner was taken to the Hillsborough County jail on Orient Road and held without bond. Most of the time, she was held in solitary confinement.

21. Representatives of TPD advised Mrs. Lane-Gardner that the basis for her arrest was the alleged sexual battery. More specifically, TPD's Criminal Report Affidavit/Notice to Appear stated the following in support of determination of probable cause:

> The six year old minor victim told police that a teacher's aid touched their [sic] private parts under their [sic] clothes, touching skin while at school. The minor victim pointed to their [sic] groin area and explained further with animation how the touch was done. The victim identified the defendant as the person who touched their [sic] private area. Defendant is identified as Tamika Denise Lane-Gardner

22. Shortly after her arrest, Officer McKinnon, who was a fledgling assistant public information officer at the time, made an unsupervised public, on-the-record statement to the media in which he stated, unequivocally, that "[t]here was penetration of the child and that's what determines the case of sexual battery as opposed to lewd and lascivious or inappropriate touching."

23. Officer McKinnon's statement that Mrs. Lane-Gardner had sexually penetrated the alleged victim had no evidentiary basis whatsoever. Furthermore, "penetration" was never alleged or written in the probable cause affidavit for Mrs. Lane-Gardner's arrest. Nevertheless, the statement was widely disseminated by the press throughout the Tampa Bay area via print, radio, television, and internet mediums. News of Mrs. Lane-Gardner "penetrating a young child was reported by www.tbo.com, by WFTV (Bay News 9), by WTSP (Tampa Bay's 10), by the Tampa Tribune, and the St. Petersburg Times, among other, just as Officer McKinnon and TPD knew that it would be.

24. The attorneys at Jung & Sisco first sought to have Mrs. Lane-Gardner, who had no prior criminal history, released on bond. On June 1, 2006, the attorneys at Jung & Sisco filed a Motion to Set Bond on Mrs. Lane-Gardner's behalf. That motion was heard on June 5, 2006. At that hearing, the assistant state attorney, acknowledged that the evidence gathered by TPD consisted solely of a criminal report affidavit which did not contain descriptions of penetration of the alleged victim. The assistant state attorney further acknowledged that the evidence gathered by TPD did not include any medical tests results or other evidence supportive of a charge of capital sexual battery. The presiding judge stated that the evidence "[was] not sufficient to allege sexual battery." Ultimately, the presiding judge granted the Motion to Set Bond for the modest amount of $15,000. Mrs. Lane-Gardner then posted bond and was released from jail after 10 days spent primarily in solitary confinement.

25. On June 14, 2006, Richard W. Keifer, of Keifer Group Investigations, conducted a polygraph examination of Mrs. Lane-Gardner. His exam revealed that Mrs. Lane-Gardner had never touch[ed] the [alleged victim's] private areas for any sexual purpose" and that Mrs. Lane-Gardner had never had "any physical sexual contact with" the alleged victim.

26. On July 7, 2006, the attorneys at Jung & Sisco wrote to Carolle Hooper, Esquire, Assistant State Attorney, to inform her that the alleged victim's mother had in the fall of 2004 make a strikingly similar accusation of sexual impropriety against a

6

woman at a day care facility to whom the mother owed money. Mrs. Hooper was also told that, the godmother of the alleged victim had firsthand knowledge of the alleged victim's mother coaching the alleged victim as to what to say happened at the Abundant Life Ministries daycare.

27. On August 8, 2006, the Hillsborough County State Attorney's Office (the "SAO") dropped all charges against Mrs. Lane-Gardner. In dropping the charges, the SAO cited three problems with the pending case according to news reports:
    a. Mrs. Lane-Gardner had denied the charges and passed a polygraph test;
    b. The SAO had found **no evidence** to corroborate the alleged victim's claims; and
    c. The credibility of witnesses had become suspect.

28. By the time the SAO dropped the charge against her, Mrs. Lane-Gardner had incurred thousands of dollars in attorneys' fees and costs in defending herself from the sexual battery charge. In addition, the actions of the City of Tampa's TPD or Officer McKinnon in instituting, maintaining, and publicizing false charges of sexual battery against Mrs. Lane-Gardner have caused Mrs. Lane-Gardner severe emotional damage, damaged her reputation, and caused her to be socially isolated and ostracized. Now, Mrs. Lane-Gardner must likely disclose the fact that she was arrested on future applications, such as school and employment applications, and her arrest information (showing a charge of rape) with arrest photo still appears on the Hillsborough County Sheriff's website for all to see. This incident will haunt her forever.

29. Detective McCaughey never received discipline, counseling, or further training in connection with her improper probable cause determination, faulty probable cause affidavit, and unlawful arrest of Mrs. Lane Gardner. In fact, Major George McNamara, an authorized TPD policy maker, reviewed Detective McCaughey's probable cause determination and the basis for it, and approved her decision.

30. The Defendants' conduct deprived Mrs. Lane-Gardner of her constitutional rights under the Fourth Amendment in that she was arrested without probable cause. Furthermore, that same conduct also deprived Mrs. Lane-Gardner of her constitutional rights under the Fourteenth Amendment in that she was subjected to false imprisonment and governmental defamation without due process. The governmental defamation injured not only her reputation, but it also was made in connection with her unconstitutional arrest and effectively foreclosed her future opportunities to pursue her chosen occupation: teaching children.

31. The City of Tampa has a policy, practice, and/or custom that encourages or allows TPD employees to intentionally, or with reckless disregard for the truth, misrepresent material facts about pending cases to the media.

32. The TPD Standard Operating Procedures ("SOP") expressly advocate "an aggressive public information program" and instruct the TPD public relations department to maintain an "aggressive approach to providing information on matters of public concern to the news media and general public." (SOP, § 540 – Media Relations, p.1). A copy of the SOP is attached as Exhibit C.

33. There is no meaningful language in the SOP designed to temper or restrain this "aggressive approach" to providing information to the media.

34. Coupled with this "aggressive approach," the SOP conspicuously fails to address and altogether omits any procedures or guidelines on either (i) the quality control of information disseminated by TPD to the media or (ii) confirming, or at least qualifying, the facts provided in public statements made to the media.

35. This policy, practice, and/or custom of the City of Tampa caused or contributed to a violation of Mrs. Lane-Gardner's constitutional rights to due process under the Fourteenth Amendment of the United States Constitution.

36. This policy, practice, and/or custom was implemented and controlled by Officer Stephen Hogue who, as Chief of Police, is a policymaker for the City of Tampa's TPD.

37. The City of Tampa and Officer Hogue were deliberately indifferent to the fact that this policy, practice, and/or custom would deprive Mrs. Lane-Gardner of her rights to due process under the Fourteenth Amendment of the United States Constitution. Indeed, the City of Tampa and Officer Hogue knew or should have known that its TPD officers were misrepresenting material facts about pending cases to the media resulting in placing arrestees in a false light. Nevertheless, the City of Tampa and Officer Hogue approved, acquiesced, and/or encouraged these actions by, among other things, failing to adequately punish the TPD officers responsible for misrepresenting material facts about pending cases to the media.

38. This policy or custom was the moving force behind the violation of Mrs. Lane-Gardner's rights to due process under the Fourteenth Amendment of the United States Constitution.\

39. The City of Tampa, through its municipal policymakers, and more specifically, Major George McNamara, officially reviewed, approved, and ratified the basis and determination of probable cause by Detective McCaughey in this case.

40. This review, approval, and ratification occurred more than once in this case. At first, Detective McCaughey's decision was approved and ratified by municipal policymakers, including, but not limited to, Major McNamara, within weeks after Mrs. Lane-Gardner's arrest. Most recently, the decision was approved and ratified on March 24, 209 at the deposition of Major McNamara in this civil rights case.

41. By such approval and ratification, the City of Tampa adopted and expressly approved Detective McCaughey's probable cause determination and, therefore, approved the acts that caused the constitutional violations in this case.

42. The City of Tampa made the conscious, affirmative choice to ratify the unconstitutional conduct in question. Based on this approval and ratification, the City of Tampa is responsible for Detective McCaughey's arrest of Mrs. Lane-Gardner in violation of her rights under the Fourteenth Amendment of the United States Constitution.

43. The City of Tampa maintained an inadequate system of reviewing probable cause affidavits filed by police officers and failed to discipline, or more closely supervise, those officers who negligently or intentionally failed to sufficiently investigate or document the statements made in probable cause affidavits, such as the defective affidavit filed in the Child Abuse Case initiated against Mrs. Lane-Gardner.

44. The foregoing acts, omissions, and deficiencies caused Detective McCaughey to be unaware of the laws and rules governing the correct procedures for the filing of a probable cause affidavit for the warrant and arrest of a suspected criminal. Also, the foregoing acts, omissions, and deficiencies further caused Detective McCaughey to believe that probable cause affidavits filed prior to a sufficient investigation of the underlying alleged incident would be condoned.

45. As a direct and proximate result of each of the previously described ratifications, acts, omissions, and deficiencies, Detective McCaughey filed a probable cause affidavit prior to a sufficient investigation of the underlying alleged incident and thus, in turn, resulted in the issuance of an unsupportable, unsubstantiated, and illegal warrant for the arrest of Mrs. Lane-Gardner in violation of her rights under the Fourth Amendment of the United States Constitution.

## **STANDARD OF REVIEW**

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that a plaintiff can prove no set of facts that would entitle the plaintiff to relief. White v. Florida Highway Patrol, 928 F. Supp. 1153, 1156 (Fla. M.D. 1996) (citing Conley v. Gibson, 355 U.S. 41 (1957)). A trial court is required to view the complaint in a light most favorable to the plaintiff. Id. (citing Sofarelli v. Pinellas

County, 931 F.2d 718, 721 (11th Cir. 1991). Although the trial court must take the allegations in a complaint as true when reviewing motions to dismiss, it is not permitted to read into the complaint facts that are not there. Id. (citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 2944-45, 92 L. Ed. 2d 209 (1986); Beck v. Interstate Brands Corp., 953 F. 2d 1275, 1276 (11th Cir. 1992)).

The purpose of a Rule 12(b)(6) motion is to test the facial sufficiency of the statement of claim for relief. Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F. 3d 1364, 1368 (11th Cir. 1997). Further, the analysis of a 12(b)(6) motion is *limited primarily to the face of the complaint and attachments to it.* Id. (Emphasis supplied). Rule 12(b)(6) is read alongside Federal Rule of Civil Procedure 8(a)(2), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), Fed. R. Civ. P. (2008). Rule 8(a)(2) is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity. Brooks, 116 F. 3d 1364, 1368 (11th Cir.1997) (citation omitted).

However, the Eleventh Circuit imposes "heightened pleading requirements" for *certain* section 1983 cases that involve individuals entitled to assert qualified immunity. Swann v. Southern Health Partners, Inc., 388 F. 3d 834 (11th Cir. 2004) (citing Leatherman v. Tarrant County, 507 U.S. 163, 113 S. Ct. 1160, 122 L.Ed.2d 517 (1993)) (emphasis supplied); see also Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) (recognizing that, in the Eleventh Circuit, a complaint must be pleaded with "heightened specificity… in civil rights actions against *public officials* who may be entitled to qualified immunity.") (Emphasis supplied).

For §1983 cases, alleging individual non-governmental liability or municipal liability, the United States Supreme Court has determined that a court may not apply a heightened pleading standard more stringent than that required by Rule 8 of the Federal Rules of Civil Procedure. Leatherman, *supra*, 507 U.S. at 164, 113 S. Ct. at 1161.

Accordingly, in determining whether a Plaintiff has stated a § 1983 claim against Defendant, City of Tampa, a municipality, this Court must be guided solely by the regular 12(b)(6) standard. See Rule 8(a)(2), Fed. R. Civ. P. (2008); Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L.Ed.2d 517 (1993); and GJR Inv., Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998).

## DISCUSSION

### I. SUFFICIENCY OF 42 U.S.C § 1983 CLAIMS

Plaintiff argues that an arrest without probable cause violates the Fourth Amendment and forms the basis for violations of § 42 U.S.C. § 1983 against Defendant City. Plaintiff further argues that the Third Amended Complaint sufficiently alleges municipal liability under § 42 U.S.C. § 1983 for the deprivation of Mrs. Lane Gardner's constitutional rights under the Fourth and Fourteenth Amendments. Defendant moves to dismiss Counts I and Count II of Plaintiff's Third Amended Complaint against the City of Tampa. Defendant argues that Count I fails to state a claim for defamation because injury to public reputation is not actionable in a section 1983 action. Defendant argues that Count I also fails to state a claim for municipal liability. Defendant further argues that Plaintiff has failed to state a claim for false imprisonment and the Plaintiff fails to state a claim

that the city is liable for the plaintiff's arrest. The Court will focus on the arguments related to policy, practice or procedure and probable cause. Each Count is treated in turn.

### A. Count I: Policy, Practice or Procedure (Municipal Liability Against the City of Tampa)

To state a claim against a municipality under 42 U.S.C. §1983, Plaintiff must allege that the municipality itself has officially sanctioned or ordered the wrongful act. City of St. Louis v. Paprontik, 485 U.S. 112, 123, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1998) (citation and quotations omitted). A municipality may be held liable for constitutional torts when it can be shown that the tort was caused by the execution of an express municipal policy, or caused by a widespread municipal custom or practice that constitutes a custom or usage that has the force of law. Id. (citations and quotations omitted); City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). Plaintiff argues that the City is liable under Section 1983 because the deprivation of Mrs. Lane-Gardner's constitutional rights were a result of the City's "aggressive information" policy. Additionally, the City violated Mrs. Lane-Gardner's constitutional rights when she was arrested without probable cause. The Plaintiff further argues that this constitutional violation was ratified by the City through the actions of Major George McNamara and through the instant lawsuit.

The City argues that there is no express policy in which the City encourages or allows TPD employees to recklessly disregard the truth and misrepresent material facts about pending cases to the media. Additionally, Major McNamara cannot be an "authorized policymaker" because he holds the rank of "Major," and only the Chief of

Police is the authorized final policymaker. The City, therefore, asserts that municipal liability does not attach because the City did not ratify the actions that caused the deprivation of the Plaintiff's rights.

### I. MUNICIPAL LIABILITY BASED ON EXPRESS POLICY

Plaintiffs must allege sufficient facts that identify a specific policy of the City; the policy must be attributable to the City and allege sufficient facts to demonstrate that the particular injury was incurred because of the execution of that policy. Samarco v. Neumann, 44 F. Supp. 2d 1276, 1287 (S.D. Fla. 1999). The Plaintiff alleges first that the City maintains an express policy that encourages or allows TPD employees to recklessly disregard the truth and misrepresent material facts about pending cases to the media. Specifically, the Third Amended complaint alleges that the TPD Standard Operating Procedures ("SOP") expressly advocate "an aggressive public information program" and instruct the TPD public relations department to maintain an "aggressive approach to providing information on matters of public concern to the news media and general public.

The Court disagrees with the Defendant that the Plaintiff has not pointed to a specific policy identified for the deprivation of Plaintiff's rights. On the contrary, the Plaintiff provides that the "aggressive public information program" that instructs the TPD public relations department to maintain an "aggressive approach to providing information on matters of public concern to the news media and general public" is a specific policy that the Plaintiff points to as the cause of her injury. The Plaintiff must now allege sufficient facts in her Third Amended Complaint demonstrating how the City falls within

municipal liability.  The Plaintiff has sufficiently connected the City's "SOP" to the City itself because they allege that the City's express policy of maintaining an "aggressive approach to providing information on matters of public concern to the news media and general public" was implemented and controlled by Officer Stephen Hogue, who is Chief of Police and a policymaker for the City of Tampa's TPD.   The Court agrees with the Plaintiff in that it is plausible that the "aggressive" policy of the City of informing the public may not have meaningful restraints in the dissemination of information.

The City argues that the SOP does provide such restraints because there are guidelines restricting the dissemination in part because there may be "potential for jeopardizing the outcome of the case, revealing legally protected information, or causing irreparable harm to the reputation of a citizen, release of certain types of information must be accomplished with great care."  It does appears that the City recognizes the need for care when disseminating information to the public; however as the Plaintiff suggests, there is nothing meaningful in stating that, care must be made when additional guidance is not provided on what those terms mean.  Because of the above reasons, a jury could reasonably conclude that the City's SOP policy was the cause of the violation of the Plaintiff's constitutional rights.  The Court finds that the Plaintiff has sufficiently alleged municipal liability based on an express policy.   This necessitates the denial of the Defendants' motion as to Count I.

## B. Count II: Lack Probable Cause/Monell Liability (Municipal Liability against the City of Tampa)

Probable cause to arrest exists "when an arrest is 'objectively reasonable based on the totality of the circumstances." McCormick v. City of Fort Lauderdale, 333 F. 3d 1234, 1243 (11th Cir. 2003) (quoting Ferraro, 284 F. 3d at 1195). "This standard is met when the facts and circumstances within the *officer's knowledge*, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id. (Emphasis added). The existence of probable cause is an absolute bar against §1983 false arrest claims. Durruth v. pastor, 351 F. 3d 1080, 1087 (11th Circ. 2003); Arline v. City of Jacksonville, 359 F. Supp. 2d 1300, 1310 (Fla. M.D. 2005) (citations omitted).

Plaintiff alleges that on May 11, 2006, a six year old girl reported to her mother that the Plaintiff had touched her inappropriately. The girl told her mother that the Plaintiff had been touching her "for a long time." After the girl's mother contacted the police, the police came and interviewed the girl on May 11, 2006 where she reported to the police officers that the alleged touching was the first instance. On May 12, 2006, Detective McCaughey briefly interviewed four members from the Walton Academy Staff. None of the staff witness interviews corroborated the purported victim's story. On May 12, 2006, Detective McCaughey also interviewed the Plaintiff who also denied the child's allegations. On the same day, the local Child Protection Team conducted a medical exam of the purported victim that did not confirm or deny the allegations of the child. On May 19, 2006, the CPT conducted a forensic interview that exposed

inconsistencies in the child's accusations; inconsistencies, such as whether the child's panties were up or down, whether the bathroom door was open or closed, the number of times the alleged touching occurred. The child and the forensic interviewer were unable to mutually agree on the vocabulary to describe the touching. On May 26, the Plaintiff was taken to the police station where she was interrogated further. Despite pleas for further investigation, the Plaintiff was arrested and charged with violation of section 794.011 of the Florida Statutes, which is felony capital sexual battery of a victim less than twelve years of age based on a probable cause determination by the arresting officer.

Construing the allegations in the Complaint in the light most favorable to the Plaintiff, the Plaintiff has alleged facts sufficient to state a cause of action against the City. In support of the Plaintiff's position, the plaintiff provides evidence that the child had provided inconsistent information regarding the alleged touching to her mother, the investigating officers, and to the Child Protection Team forensic interviewer. These inconsistencies are probative of the reliability of the child's statement. "When a child victim gives inconsistent statements about an accusation of sexual abuse, the child's accusation alone may not be enough to establish probable cause." Molnar v. Care House, 574 F. Supp. 2d 772, 792 (E.D. Mich. 2008); Cleary v. County of Macomb, 2007 WL 2669102 (E.D. Mich. Sept. 6, 2007). The Court agrees with the Plaintiff that there was nothing to corroborate the child's inconsistent allegations. If you are going to base a probable cause determination solely on the statements of a child victim it would only make sense to have a solid consistent statement upon which to rely. With an inconsistent statement and nothing else, it is not reasonable to find probable cause. A liberal reading of portions of Plaintiff's Third Amended Complaint may plausibly state a claim

16

sufficient to sustain an action against Defendant. However, the next step in the analysis is whether the constitutional violation is attributable to the City of Tampa by way of an express policy, practice or procedure

## II. MUNICIPAL LIABILITY BASED ON RATIFICATION

Defendant argues that there is no express municipal policy or pre-existing custom which was sanctioned by the final policymaker for the City of Tampa's Police department that could hold the City of Tampa liable for the unconstitutional violation. Moreover, the decision maker must possess final authority to establish municipal policy. Pembaur v. Cincinnati, 475 U.S. 469, 581 (1986). Final policymaking authority for section 1983 purposes is determined by state and local law. Id.

The Court disagrees with the Defendant that the Plaintiff has alleged no express municipal policy or pre-existing custom. The Plaintiff alleges that the Defendant, City has a custom of (1) maintaining an inadequate system of reviewing probable cause affidavits filed by police officers, (2) failed to discipline, or more closely supervise, those officers who negligently or intentionally failed to sufficiently investigate or document the statements made in probable cause affidavits, such as the defective affidavit filed in the Child Abuse Case initiated against the Plaintiff. Furthermore, the Plaintiff states that her unconstitutional arrest was directly caused by these customs "which allowed Detective McCaughey to believe that probable cause affidavits filed prior to a sufficient investigation of the underlying alleged incident would be condoned."

Defendant argues that municipal liability does not attach unless the Plaintiff can demonstrate that the final policymaker approved of the decision. Defendant state that in Florida, the Chief of Police has final policymaking authority. Cooper v. Dillon, 403 F.

17

3d 1208, 1221 (11th Cir. 2005). Plaintiff does not refute that the Chief of Police is the final policymaking authority for the TPD. The Plaintiffs allege in their Third Amended Complaint that Major George McNamara is an authorized policymaker for the City in that he was designated by the City to be its representative at the City's Rule 30(b)(6) deposition in the instant law suit and that the City has defended the actions of the arresting police officer, Detective McCaughey's basis for probable cause and her investigatory steps from the outset of this case. These actions the Plaintiff asserts form the basis of the City's ratification. The Court agrees with the Defendant and finds Major George McNamara's decision insufficient to state a claim of municipal liability because the decision maker must possess final authority to establish municipal policy. Pembaur v. Cincinnati, 475 U.S. 469, 581 (1986). "Only those officials who have final policymaking authority may render the municipality liable under § 1983." Id. at 469. Major George McNamara may be an authorized policymaker for the City but that does not make him the **final** "policymaker" for the City. The Plaintiff does not allege facts that the Chief of Police, Stephen Hogue, knew of the arrest or that he approved of the arrest of the Plaintiff. Plaintiff nevertheless asserts that the Defendant is liable under a ratification theory. Ratification occurs, "If authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." St. Louis v. Praprotnik, 485 U.S. 112, 127. For Plaintiff to state a successful section 1983 claim against a municipality [ or other local governmental entity] based on a ratification theory…they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis." Sherrod v. Palm Beach Co.

School Dist., 424 F. Supp. 2d 1341, 1346. The Plaintiff's Complaint fails on this theory because there is no allegation on the face of the Complaint to demonstrate that the Chief of Police, Stephen Hogue, knew of the arrest or reviewed the basis for the arrest. The Complaint only alleges that Major George McNamara reviewed the basis for probable cause. This necessitates the granting of Defendants' motion as to Count II.

## CONCLUSION

This Court agrees with Plaintiff that Counts I of Plaintiff's Third Amended Complaint sufficiently alleges municipal liability based on an express policy. Although the Court agrees with the Plaintiff that there may have been insufficient evidence of probable cause to arrest the Plaintiff, the Court disagrees with the Plaintiff that the City is liable under municipal liability for those actions. Accordingly, it is

**ORDERED** that Defendants' Motion to Dismiss 42 U.S.C § 1983 against Defendant, City of Tampa (Count I ), is **DENIED,** and Defendants' Motion to Dismiss Plaintiff 42 U.S.C § 1983 against Defendant, City of Tampa (Count II ), is **GRANTED** with prejudice. This case may go forward only as to Count I of the Third Amended Complaint. The Defendant shall answer the remaining Count within (10) days of this order.

**DONE AND ORDERED** in Chambers at Tampa, Florida on October 20th, 2009.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record